UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| AHARON L. ATOMANCZYK, | § § | CIVIL ACTION NO. 4:17-cv-00719 |
| Plaintiff, | § | |
| | § | |
| | § | |
| vs. | § | JUDGE CHARLES ESKRIDGE |
| | § | |
| | § | |
| TEXAS DEPARTMENT | § | |
| OF CRIMINAL JUSTICE | § | |
| and BRYAN COLLIER, | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION
GRANTING SUMMARY JUDGMENT IN PART**

Plaintiff Aharon L. Atomanczyk has been incarcerated in several Texas prisons since 1996. He complains of an inability to practice his Jewish religious beliefs, asserting that he has been unlawfully denied kosher food, participation in communal prayer services, and access to rabbinic visits and chaplaincy services. He brings claims against Defendants Texas Department of Criminal Justice and its executive director, Bryan Collier, under the Americans with Disabilities Act, the Rehabilitation Act, and the Religious Land Use and Institutionalized Persons Act.

The motion for summary judgment by Atomanczyk is granted on his RLUIPA claim as to the sincerity of his religious beliefs. It is denied in all other respects. Dkt 109.

The motion for summary judgment by Defendants is granted on the RLUIPA claim as to prison security being a compelling governmental interest in relation to participation in communal prayer services. It is denied in all other respects. Dkt 107.

1. Background

Atomanczyk was given a life sentence upon conviction of capital murder in 1996. Dkt 109-2 at ¶ 4 (Atomanczyk

declaration). He describes himself as an "Ultra-Orthodox" Jewish inmate. Dkt 109-2 at ¶ 3. This dispute concerns his accommodations and access to religious services since 2015 while incarcerated in several jails administered by the TDCJ.

The Stringfellow Unit (in Brazoria County) provides the TDCJ's so-called *Enhanced Jewish Services Program.* Id at ¶¶ 7–8. This program provides inmates with free kosher food prepared on the premises, weekly visits by a rabbi, and rabbi-led congregational services. See Dkt 110-1 at 3 (TDCJ chaplaincy manual); Dkt 110-3 (TDCJ memo on Jewish religious programming). Stringfellow is one of four units that provide Jewish services and is the only one that provides the Enhanced Jewish Services Program. The other three units are Jester III (in Fort Bend County), Stiles (in Jefferson County), and Wynne (in Walker County), which provide the so-called *Basic Jewish Services Program.* Dkt 110-1 at 3. That program provides inmates with kosher products for purchase, monthly visits by a rabbi, and rabbi-led congregational services. Id at 3–4. Other units don't provide a specific program for the practice of Jewish beliefs.

Atomanczyk was assigned to Stringfellow from 2013 to 2015. The TDCJ transferred him in December 2015 to Jester III based on an assessment of medical need. Dkt 107-2 at 4 (affidavit of Wayne Brewer, then-Warden of Stringfellow Unit). The TDCJ assigns inmates to its several units based on (among other criteria) an assessment by the University of Texas, Medical Branch as to which locations can accommodate an inmate's medical restrictions. UTMB determined that Atomanczyk had "permanent significant overall physical capacity limitations" due in part to cardiovascular disease, which meant that Atomanczyk would be limited on his ability to walk, climb, and perform certain physical work. Id at 5–7. UTMB also determined that he required confinement in a facility able to provide twenty-four-hour medical care. Id at 8.

Although Jester III participates in the Basic Jewish Services Program, Atomanczyk didn't initially seek or receive kosher food while incarcerated there. That's because in June 2015, six months before his transfer, he changed his religious preference from *Jewish* to *Messianic Jewish.* Dkt 107-1 at 8–9 (Atomanczyk

deposition). The TDCJ characterizes the latter preference as a Christian sect. Dkt 107-3 at 3 (affidavit of Dr Michael Rutledge, TDCJ deputy director of evidence-based operations). Atomanczyk disagrees with this, saying it is a Jewish denomination. Dkt 107-1 at 7–8. Regardless, the change in religious preference rendered Atomanczyk ineligible to participate in either the Basic or Enhanced Jewish Services Programs under TDCJ policy. Dkt 107-3 at 3.

Atomanczyk continued that religious preference until September 2016. He then changed his religious preference from *Messianic Jewish* to *Satu Mare Hassidic Jewish*. Ibid; Dkt 107-1 at 3 (Atomanczyk deposition); see also Dkt 107 at 18. The TDCJ characterizes such preference as Jewish, meaning Atomanczyk was then eligible to participate in Jester III's Basic Jewish Services Program. Dkt 107-1 at 3; Dkt 107-3 at 3.

Shortly after that change in religious preference, Atomanczyk filed an administrative grievance, seeking various religious accommodations, including free kosher food. See Dkt 107-5 (grievance). The TDCJ denied the grievance. See id at 4 (initial TDCJ response); Dkt 109-2 at ¶ 17; see also Dkt 107 at 18 (noting denial of grievance in TDCJ brief).

The TDCJ then transferred Atomanczyk to the Stiles Unit in April 2016. It did so because he received two disciplinary violations that resulted in the demotion of his security level. Dkt 107-2 at 8 (Brewer affidavit). Stiles is able to provide twenty-four-hour medical care to inmates who pose security concerns, while also providing the Basic Jewish Services Program. Id at 9; see also Dkt 110-1 (TDCJ chaplaincy manual).

The TDCJ began to provide Atomanczyk with free kosher food from KO Kosher Service at Stiles in May 2017. Dkt 107-6 at 2–3 (affidavit of Jonathon Logan, TDCJ kitchen captain). Neither side addresses why this change was implemented. In any event, the parties dispute the quality of this food. The *hechsher* is a rabbinical endorsement or certification, especially of food products that conform with traditional Jewish dietary laws. See Dkt 109-3 at 5–6 (report of Plaintiff's expert Rabbi Marinovsky). Atomanczyk claims that the hechsher on the entrees he receives isn't adequate to satisfy his religious obligations. On that basis,

he refused to eat the entrees for the months spanning June to October 2017 and December 2017 to some point in mid-2018. Dkt 109-2 at ¶¶ 23–27 (Atomanczyk declaration). After losing thirty-five pounds and experiencing "equilibrium and balance problems," he then began to eat the KO Kosher Service entrees and continues to do so at present. Id at ¶¶ 27–31.

The TDCJ next transferred Atomanczyk to the Hughes unit in June 2017 following his involvement in a fight with two other inmates. It then transferred him back to Jester III in December 2017 for a brief time after promoting his security level. Atomanczyk was then involved in a more serious fight with another inmate in February 2018. TDCJ again demoted his security level to require housing in administrative segregation and transferred him to the Polunsky Unit (in Polk County), where he remains at present. Dkt 107-2 at 8–9 (Brewer affidavit).

Polunsky is capable of housing inmates in administrative segregation. It doesn't participate in the Jewish Services Program. See Dkt 110-1 at 3. Even so, the TDCJ continues to provide Atomanczyk free kosher food. Dkt 109-2 at ¶¶ 23–31 (Atomanczyk declaration). But he isn't permitted to participate in communal prayer services because of the administrative segregation. And the TDCJ doesn't pay a rabbi to visit Polunsky, as it does for Stringfellow, Jester III, Stiles, and Wynne. See Dkt 110-1 at 3–5 (TDCJ chaplaincy manual). Beyond this, the parties don't offer evidence to specify the unit's capabilities with respect to religion and health accommodations and security level.

Atomanczyk filed his initial complaint *pro se* in March 2017, following denial of his grievance by the TDCJ. After retaining counsel and obtaining leave, he filed an amended complaint. See Dkts 17 and 20. He asserts that Defendants discriminated against him on the basis of his disability when they transferred him from Stringfellow to Jester III, in violation of Title II of the Americans with Disabilities Act, 42 USC § 12131 *et seq*, and the Rehabilitation Act, 29 USC § 794 *et seq*. He also alleges under those Acts that Defendants have failed to provide reasonable accommodations for his alleged disability. He further asserts that Defendants have imposed a substantial burden on the practice of

his religion in violation of the Religious Land Use and Institutionalized Persons Act, 42 USC § 2000cc *et seq*. See Dkt 21.

Atomanczyk seeks compensatory damages for the past violations of the ADA and the Rehabilitation Act. He also seeks a permanent injunction under the ADA, Rehabilitation Act, and RLUIPA that would order Defendants to provide him with the services he seeks. Specifically, he seeks an order that Defendants be required to provide him "with access to the benefits of the Enhanced Jewish Services Program—including access to a nutritionally sufficient kosher diet, weekly communal Shabbat prayer services at the direction of an ordained Orthodox rabbi, daily communal prayer services, weekly rabbinic visits, and on-site chaplaincy services." Dkt 21 at pp 11–12.

During this litigation, Atomanczyk retained the expert services of Dr Joseph S. Kass, a professor of neurology and psychiatry at the Baylor College of Medicine. He diagnosed Atomanczyk in October 2018 with small fiber neuropathy. The associated symptoms are dizzy spells, balance problems, parathesia (that is, burning, prickling, or numbness), and seizures. Dkt 109-2 at ¶¶ 14–16 (Atomanczyk declaration); Dkt 109-4 (Kass expert report). Atomanczyk characterizes this condition as a disability and asserts that it was the cause of his transfer to Jester III. Dkt 116 at 17–20. The TDCJ doesn't dispute that Atomanczyk was transferred to Jester III "for 24-hour medical care." Dkt 107 at 15. It further assumes that Atomanczyk's small fiber neuropathy and related symptoms were the cause for the reassignment. But, as will be addressed in more detail below, it disputes that this condition is a disability within the meaning of the pertinent law. Id at 15–17. Curiously, neither party mentions the cardiovascular disease noted in Brewer's affidavit that (at least on that evidence) was the cause for his transfer.

Defendants moved for summary judgment on all claims after the close of discovery, arguing that Atomanczyk's complaint should be dismissed. Dkt 107. Atomanczyk also moved for summary judgment, arguing that he is entitled to judgment as a matter of law on his RLUIPA claim and that he has proven that he has a qualifying disability for purposes of the ADA and the Rehabilitation Act claims. Dkt 109.

2. Legal standard

Rule 56(a) of the Federal Rules of Civil Procedure requires a court to enter summary judgment when the movant establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is *material* if it "might affect the outcome of the suit under the governing law." *Sulzer Carbomedics, Inc v Oregon Cardio-Devices, Inc*, 257 F3d 449, 456 (5th Cir 2001), quoting *Anderson v Liberty Lobby, Inc*, 477 US 242, 248 (1986). And a dispute is *genuine* if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v CCC & R Tres Arboles, LLC*, 736 F3d 396, 400 (5th Cir 2013), quoting *Anderson*, 477 US at 248.

The summary judgment stage doesn't involve weighing the evidence or determining the truth of the matter. The task is solely to determine whether a genuine issue exists that would allow a reasonable jury to return a verdict for the nonmoving party. *Smith v Harris County*, 956 F3d 311, 316 (5th Cir 2010), quoting *Anderson*, 477 US at 248. Disputed factual issues must be resolved in favor of the nonmoving party. *Little v Liquid Air Corp*, 37 F3d 1069, 1075 (5th Cir 1994). All reasonable inferences must also be drawn in the light most favorable to the nonmoving party. *Connors v Graves*, 538 F3d 373, 376 (5th Cir 2008), citing *Ballard v Burton*, 444 F3d 391, 396 (5th Cir 2006).

The moving party typically bears the entire burden to demonstrate the absence of a genuine issue of material fact. *Nola Spice Designs LLC v Haydel Enterprises Inc*, 783 F3d 527, 536 (5th Cir 2015) (quotation omitted); see also *Celotex Corp v Catrett*, 477 US 317, 322–23 (1986) (citations omitted). But when a motion for summary judgment by a defendant presents a question on which the plaintiff bears the burden of proof at trial, the burden shifts to the plaintiff to proffer summary judgment proof establishing an issue of material fact warranting trial. *Nola Spice*, 783 F3d at 536 (quotation omitted). To meet this burden of proof, the evidence must be both "competent and admissible at trial." *Bellard v Gautreaux*, 675 F3d 454, 460 (5th Cir 2012) (citation omitted).

When parties file opposing motions for summary judgment on the same issue, the court reviews each motion independently,

each time viewing the evidence and inferences in the light most favorable to the nonmoving party. *Amerisure Insurance Co v Navigators Insurance Co*, 611 F3d 299, 304 (5th Cir 2010) (quotation omitted). Each movant must establish that no genuine dispute of material fact exists, such that judgment as a matter of law is in order. Ibid; see also *Tidewater Inc v United States*, 565 F3d 299, 302 (5th Cir 2009).

### 3. Analysis

Defendants move for summary judgment on a total of nineteen issues and sub-issues of a wide-ranging and variegated nature. See Dkt 107 at 2. Atomanczyk doesn't purport to raise nearly as many discrete issues, but still, he seeks summary judgment as to his entire RLUIPA claim and important aspects of his ADA and Rehabilitation Act claims. See Dkt 109.

Between them, the parties have submitted a total of 182 pages of briefing, exclusive of attachments. Lacking overall was a realistic assessment of the record and attendant standard of review. Precedent on these topics dictates that these are fact-intensive inquiries, making them infrequently appropriate to resolution as a matter of law. Does Atomanczyk sincerely hold his religious beliefs? Quite obviously, yes. Is prison security a compelling governmental interest in relation to participation in communal prayer services? Of course. But beyond that, it was clear from the outset that genuine disputes of material fact exist on all other issues.

Atomanczyk's claims under the Americans with Disabilities Act and the Rehabilitation Act are considered together, followed by his claims under the Religious Land Use and Institutionalized Persons Act.

### a. Claims under the Americans with Disabilities Act and the Rehabilitation Act

Title II of the ADA provides, "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 USC § 12132. *Public entities* are defined to include agencies or departments of state governments. 42 USC

§ 12131(1)(B). The ADA creates a private right of action against those entities for monetary and equitable relief. See 42 USC § 12133.

The language of Title II tracks the language of § 504 of the Rehabilitation Act. See *Hainze v Richards,* 207 F3d 795, 799 (5th Cir 2010). In that regard, § 504 provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 USC § 794(a).

Further, the ADA specifically provides, "The remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title." 42 USC § 12133. As such, the elements necessary to state a case of discrimination under the Rehabilitation Act are "operationally identical" to those under the ADA. *Melton v Dallas Area Rapid Transit*, 391 F3d 669, 676 n 8 (5th Cir 2004).

To establish a *prima facie* case of discrimination under Title II of the ADA and § 504 of the Rehabilitation Act, a plaintiff must demonstrate that:

- *First,* he's a qualified individual within the meaning of the ADA;

- *Second,* he's being excluded from participation in (or being denied benefits of) services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and

- o *Third,* the exclusion, denial of benefits, or discrimination is by reason of his disability.

*Melton,* 391 F3d at 671–72 (as to ADA); see also *Greer v Richardson Independent School District,* 472 F Appx 287, 291 n 1 (5th Cir 2012) (as to Rehabilitation Act).

In addition, the Prison Litigation Reform Act of 1995 requires a prisoner seeking compensatory damages under the ADA and the Rehabilitation Act to show that he sustained a physical injury. 42 USC § 1997e(e); see *Mayfield v Texas Department of Criminal Justice,* 529 F3d 599 (5th Cir 2008). A physical injury "need not be significant," but it must be more than *de minimis. Siglar v Hightower,* 112 F3d 191, 193 (5th Cir 1997).

### i. Sovereign immunity

Atomanczyk seeks compensatory damages. Defendants assert state sovereign immunity by argument that can be described as cursory at best. See Dkt 107 at 9, 11, 26; compare *Meyers v Texas,* 410 F3d 236, 251 (5th Cir 2005) (noting failure to explain "how or why" sovereign immunity applied). To the contrary, the applicability of such defense presents a complicated legal question that requires analysis of which aspects of the alleged conduct by the State violated Title II; to what extent such misconduct also violated the Fourteenth Amendment; and whether (insofar as such conduct violated Title II but didn't violate the Fourteenth Amendment) the purported abrogation of sovereign immunity by Congress in such contexts is nevertheless valid. *Smith v Hood,* 900 F3d 180, 184 (5th Cir 2018), quoting *United States v Georgia,* 546 US 151, 159 (2006).

As discussed below, Atomanczyk has raised sufficient question whether Defendants have violated Title II. And he doesn't appear to allege that Defendants have violated the Fourteenth Amendment. While assertion of sovereign immunity isn't entirely foreclosed, it is denied here. Defendants may reassert it with pretrial briefing, so long as appropriate attention is given to the analysis required by *United States v Georgia.*

### ii. Discrimination theory

Defendants seek summary judgment on three issues— whether Atomanczyk is a qualified individual due to disability,

whether the challenged actions are by reason of any disability, and whether he has suffered a physical injury. Dkts 107 at 26–30. Atomanczyk defends against these and, in turn, moves for summary judgment that his diagnosis of small fiber neuropathy is a qualifying disability. Dkt 109 at 29–30.

## A. Qualified individual

A person is a *qualified individual* under the ADA if he has a *disability* within the meaning of that statute. See 42 USC § 12132. The same terms apply with respect to claims made under the Rehabilitation Act. For example, see *Epley v Gonzalez,* --- F Appx ---, 2021 WL 2351155, *3 (5th Cir, *per curiam*). A number of definitions must be understood in this regard.

A *disability* is defined as "a physical or mental impairment that substantially limits one or more major life activities." 42 USC § 12102(1)(A). A *physical impairment* includes "[a]ny physiological disorder or condition . . . affecting one or more body systems." 28 CFR § 35.108(b)(1)(i). *Major life activities* include (as pertinent here) standing, walking, and climbing. See 42 USC § 12102(2)(A)–(B). And *substantially limits* generally means:

> (i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average persons in the general population can perform the same major life activity.

*Foreman v Babcock & Wilcox Co*, 117 F3d 800, 805 (5th Cir 1997), citing 29 CFR § 1630.2(j)(1).

Consensus exists among the parties that Atomanczyk has a physical impairment. But the parties sharply disagree whether this substantially limits any major life activity.

As noted above, Dr Joseph Kass is a professor of neurology and psychiatry at the Baylor College of Medicine, who serves here as an expert to Atomanczyk. He diagnosed Atomanczyk in October 2018 with small fiber neuropathy. The associated

symptoms include dizzy spells, balance problems, numbness, and seizures. Dkt 109-2 at ¶¶ 14–16 (Atomanczyk declaration); Dkt 109-4 (Kass expert report). Atomanczyk claims that this substantially limits his ability to walk, stand, and climb. Dkt 109-2 at ¶¶ 14–16 (Atomanczyk declaration). And so it also means, he argues, that he has a disability as a matter of law. Dkt 109 at 29; Dkt 116 at 17–20.

Defendants don't dispute that Atomanczyk was transferred to Jester III "for 24-hour medical care." Dkt 107 at 15. They also don't dispute that Atomanczyk has small fiber neuropathy or that he experiences "occasional episodes of unconsciousness." Dkt 114 at 26. But they disagree that it substantially limits any major life function. They argue that Dr Kass didn't form an opinion on whether the diagnosis affects Atomanczyk's ability to walk, stand, or move. And they assert that Dr Kass also can't confirm that any past seizures were caused by that condition. Id at 26–27. And so, they say, Atomanczyk fails as a matter of law to prove the extent of his physical condition and the extent of the condition's limitations. Dkt 114 at 25–27.

Summary judgment isn't warranted on the issue of whether Atomanczyk is a *qualified individual* under the ADA. Whether a plaintiff has a disability under the ADA is ordinarily a question of fact. *Foreman*, 117 F3d at 805–06; *Kemp v Holder*, 610 F3d 231, 234–35 (5th Cir 2010) (same as to Rehabilitation Act). And both parties fall far short of establishing the absence of genuine questions of material fact when viewing this evidence in the light most favorable to each party in turn. Most troublesome, left entirely unexplained is why neither party addresses the cardiovascular disease that limited Atomanczyk's ability to walk, climb, and perform certain physical work to such degree that the TDCJ first moved him from Stringfellow to Jester III in December of 2015. See 107-2 at 5–8 (Brewer affidavit). Even beyond this, the diagnosis by Dr Kass can't by itself be said to conclusively establish that the diagnosis of small fiber neuropathy substantially limits a major life activity. But neither can it be said on this record that no reasonable jury could find that Atomanczyk has a qualifying disability—especially given the unexplained circumstances of his cardiovascular disease.

## B.  Intentional discrimination

A plaintiff must show that the denial was intentional to establish discrimination by reason of disability. *Guerra v San Benito Consolidated Independent School District*, 374 F Supp 3d 616, 624 (SD Tex 2019), citing *Delano-Pyle v Victoria County*, 302 F3d 567, 574 (5th Cir 2002). Defendants move for summary judgment on the issue of *intentionality*.

The Fifth Circuit hasn't determined the appropriate standard by which to determine intentionality as to claims under the ADA and the Rehabilitation Act. *Smith*, 956 F3d at 318; see also *Perez v Doctors Hospital at Renaissance, Ltd*, 624 F Appx 180, 184 (5th Cir 2015, *per curiam*). But several circuits have held it to be one of deliberate indifference. *Taylor v Hartley*, 488 F Supp 3d 517, 543 (SD Tex 2020), citing *McCollum v Livingston*, 2017 WL 2215627, *2 n 3 (SD Tex) (collecting cases from Second, Third, Ninth, Tenth, and Eleventh Circuits). That standard will be applied here. It requires the plaintiff to show knowledge that the policy or conduct is substantially likely to violate a federally protected right, along with failure to act despite that knowledge. *Durrell v Lower Merion School District*, 729 F3d 248, 265 (3d Cir 2013), citing *Duvall v County of Kitsap*, 260 F3d 1124, 1139 (9th Cir 2001). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Havens v Colorado Department of Corrections*, 897 F3d 1250, 1266 (10th Cir 2018), quoting *McCullum v Orlando Regional Healthcare System, Inc*, 768 F3d 1135, 1147 (11th Cir 2014); see also *Taylor*, 488 F Supp 3d at 544.

Atomanczyk argues that he has sufficiently established deliberate indifference. The TDCJ, he says, transferred him to Jester III because UTMB recommended housing him at a facility with capacity to provide round-the-clock medical care. This means that he was transferred because he's disabled—otherwise, he would have remained at Stringfellow and been able to participate in the Enhanced Jewish Services Program. He doesn't argue that the transfer alone was unlawful, contending instead that Defendants violated the ADA and the Rehabilitation Act by denying his grievance. They would have independently known

that he couldn't receive the benefits of the Enhanced Jewish Services Program at Jester III because of his condition. And in any event, his grievance expressly alleged that he can't reside at Stringfellow because of his disability. See Dkt 107-5 at 3 (grievance). As such, Defendants knew Atomanczyk couldn't participate in the Enhanced Jewish Services Program because of his disability and still denied him accommodation. See Dkt 116 at 22–25.

Defendants argue that the cause of denial was Atomanczyk's own conduct, which resulted in his transfer from Jester III to Stiles, then to Hughes, back to Jester III, back to Stiles, and then to Polunsky. Defendants acknowledge that all of these units provide less comprehensive Jewish services than Stringfellow, with Hughes and Polunsky ordinarily not providing any. But those transfers, Defendants say, have nothing to do with any alleged disability and were made instead for safety and security reasons due to disciplinary violations. See Dkts 107-3 (Rutledge affidavit), 107-2 at 8–9 (Brewer affidavit). This means, they say, that Atomanczyk wasn't denied participation in the Enhanced Jewish Services Program *by reason of* his alleged disability, but rather, only because of the transfers made necessary by his own misbehavior. Dkt 107 at 19–23.

Defendants also argue that their denial of Atomanczyk's grievance doesn't constitute deliberate indifference because his alleged disability wasn't the *sole* reason for the denial. Dkt 107 at 17–18. They point to the grievance itself, which didn't ask Defendants to transfer Atomanczyk back to Stringfellow, but instead asked them to provide the Enhanced Jewish Services Program at Jester III. Dkt 107-5 at 3–4 (grievance). And so, Defendants say, Atomanczyk "has also been denied [Enhanced Jewish Services] because he has not requested to return to Stringfellow Unit—despite being assigned to units that did not have the Enhanced Jewish Services Program." Dkt 107 at 18.

Summary judgment in favor of Defendants on the issue of *intentionality* isn't appropriate on this record. As to violations alleged to have occurred before Atomanczyk received disciplinary sanction, this conclusion is clear. His grievance explicitly asserted that he wasn't permitted to participate in the

Enhanced Jewish Services Program because his disabilities required that he be housed at Jester III. See Dkt 107-5 at 3–4 (grievance). This means that Defendants certainly knew of those claims when denying his grievance. Defendants aren't precluded from expanding later on argument that circumstances somehow meant that they weren't obligated to accommodate him altogether. But their evidence and legal argument aren't sufficient to resolve the issue at this point as a matter of law.

Even as to violations alleged to have occurred after Atomanczyk received disciplinary sanction, disputes of material fact exist. Evidence certainly exists in favor of Defendants that they transferred Atomanczyk from Jester III and the other locations for reasons of discipline, not disability. But the facts are muddled on this issue, with neither party clearly explaining them. For example, the parties don't address whether the medical restrictions identified by UTMB in December 2015 still apply to Atomanczyk and/or factor into decisions on where to house him. Also unaddressed is the capacity of the Hughes and Polunsky units (which don't participate in the Jewish Services Program at all) to accommodate pertinent medical restrictions, to the extent such accommodations are still needed. And in this respect, it's also impossible to tell the extent to which TDCJ transferred Atomanczyk on the basis of security concerns versus health concerns. It may be that the overriding or predominant cause of the transfers was always the disciplinary infractions. But it could also be that TDCJ transferred Atomanczyk to Stiles and Jester III (which participate only in the Basic Jewish Services Program) and to Hughes and Polunsky (which don't participate in the Jewish Services Program at all) in meaningful part because of health restrictions. If the latter is true, it could then be that Atomanczyk's access to Jewish services was limited because of his disability.

The underlying facts and legal argument on this point are far from clear. And so it is the burden on Defendants that defeats them, for they haven't adequately shown the absence of genuine disputes of material fact supporting entitlement to judgment as a matter of law.

## C. Physical injury

The parties dispute whether Atomanczyk sustained a physical injury from the pertinent violations. Atomanczyk states in his declaration that he refused to eat the food that he believes to be insufficiently kosher, and that this caused him to experience extreme weight fluctuations. He also avers that the diet aggravated his small fiber neuropathy and other physical conditions. See Dkt 109-2 at ¶¶ 25–31 (Atomanczyk declaration); see also Dkt 116 at 25–26.

Defendants previously moved for judgment on the pleadings as to this absence-of-injury issue. See Dkt 65. Judge Sim Lake addressed that motion when this case was assigned to him. He observed, "The Fifth Circuit has left open the possibility that a denial of adequate nutrition that places an inmate's health at risk, such as weight loss or 'other adverse physical effects,' could meet the threshold showing of harm that is actionable." Dkt 70 at 11, quoting *Berry v Brady*, 192 F3d 504, 508 (5th Cir 1999). As such, he denied the motion, finding that judgment for Defendants on the complaint wasn't warranted.

Defendants now seek summary judgment, arguing that they've proven Atomanczyk didn't suffer physical injury. Without much elaboration, they assert, "In this motion, TDCJ now proves that it provides him with nutritionally adequate kosher food. His request for damages . . . must be dismissed." Dkt 107 at 14. They provide evidence substantiating the food provided. See id at 22, citing Dkts 107-6 (Logan affidavit), 107-8 (affidavit of defense expert Dr Brittany Crim). Atomanczyk argues to the contrary that he lost between thirty and forty pounds during the time that he refused to eat the provided food of allegedly insufficient kosher certification. See Dkts 109-2 at ¶¶ 30–31 (Atomanczyk declaration), 109-4 at 6–7 (Kass expert report). This, he says, establishes that he suffered more than a *de minimis* injury, as does his evidence that he "suffered weakness, light-headedness, an inability to concentrate, memory loss, worsening problems with his equilibrium," as well as "additional injuries related to his neurological restriction." Dkt 116 at 26.

Summary judgment isn't appropriate on this issue of *physical injury*. At a minimum, evidence from Defendants to

substantiate the quantity and quality of the food they provide Atomanczyk is only relevant if he wasn't entitled to reject the food on religious grounds—a point that isn't yet resolved. Beyond this, Atomanczyk has certainly produced at least some evidence that he suffered more than just weight loss from the allegedly inadequate meals. And even as to weight loss alone, evidence of a weight swing of over thirty pounds is certainly pertinent under Fifth Circuit precedent. See *Berry*, 192 F3d at 508.

### iii.   Failure-to-accommodate theory

Beyond prohibition of discrimination on the basis of disability, the ADA and the Rehabilitation Act "impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." *Smith*, 956 F3d at 317, quoting *Bennett-Nelson v Louisiana Board of Regents*, 431 F3d 448, 454 (5th Cir 2005). To establish a *prima facie* case on such claim, a plaintiff must show that he is a qualified individual with a disability, the disability and its consequential limitations were known by the covered entity, and the entity failed to make reasonable accommodations. *Smith*, 956 F3d at 317, quoting *Ball v LeBlanc*, 792 F3d 584, 596 n 9 (5th Cir 2015).

Atomanczyk appears to assert a failure-to-accommodate claim. Dkt 21 at ¶¶ 32–36. Neither of the motions for summary judgment address this theory beyond the points argued as to discrimination. As such, it will also proceed.

### b.   Claims under the Religious Land Use and Institutionalized Persons Act

Atomanczyk claims that several of the policies implemented by Defendants unlawfully limit his observance of Jewish religious practices in violation of the Religious Land Use and Institutionalized Persons Act of 2000. Dkt 21 at ¶¶ 28–31. He requests injunctive relief ordering them to adopt policies conforming with his requests.

The pertinent statutory text provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule

16

of general applicability, unless the government demonstrates that imposition of the burden on that person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 USC § 2000cc-1(a)(1)–(2).

The Fifth Circuit instructs that RLUIPA requires a burden-shifting analysis. The plaintiff must initially show that the challenged government practice imposes a substantial burden on his or her religious exercise. If shown, "the burden shifts to the government 'to show that its action or policy is the least restrictive means of furthering a compelling interest.'" *Brown v Collier*, 929 F3d 218, 229 (5th Cir 2019), quoting *Chance v Texas Department of Criminal Justice*, 730 F3d 404, 410 (5th Cir 2013); see also *Holt v Hobbs*, 574 US 352, 364, 368–69 (2015).

RLUIPA defines *religious exercise* to mean "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 USC § 2000cc-5(7)(A). Implied within this is a requirement that the religious belief be *sincerely held*. See *Moussazadeh v Texas Department of Criminal Justice*, 703 F3d 781, 790 (5th Cir 2012), citing *United States v Seeger*, 380 US 163, 185 (1965).

A *substantial burden* is imposed on religious exercise where the government practice "truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs." *Adkins v Kaspar*, 393 F3d 559, 569–70 (5th Cir 2004). A violation is *significant* in this regard "when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs." Id at 570, citing *Sherbert v Verner*, 374 US 398 (1963), and *Thomas v Review Board of the Indiana Employment Security Division*, 450 US 707 (1981). By contrast, a government practice imposes no substantial burden "if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not generally allowed." *Adkins*, 393 F3d at 570, citing

*Lyng v Northwest Indian Cemetery Protective Association*, 485 US 439 (1988). This is a fact-intensive inquiry that requires a case-by-case analysis. *Turner v Texas Department of Criminal Justice*, 836 F Appx 227, 230 (5th Cir 2021, *per curiam*), citing *Adkins*, 393 F3d at 571.

As to defining a *compelling governmental interest* in the religious-exercise context, the Supreme Court stresses, "The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Wisconsin v Yoder*, 406 US 205, 215 (1972). Both the Supreme Court and the Fifth Circuit have returned to this articulation in recent years. See *Fulton v City of Philadelphia*, 141 S Ct 1868, 1881 (2021), quoting *Church of the Lukumi Babalu Aye v City of Hialeah*, 508 US 520, 546 (1993), in turn quoting *Yoder*, 406 US at 215; *McAllen Grace Brethren Church v Salazar*, 764 F3d 465, 472 (5th Cir 2014) (quoting *Yoder*). The Fifth Circuit likewise observes, "In this highly sensitive constitutional area, only the gravest abuses, endangering paramount interests, give occasion for permissible limitation." *Combs v Central Texas Annual Conference of United Methodist Church*, 173 F3d 343, 346 (5th Cir 1999) (quotation omitted). This consists of a "'focused inquiry' that requires the government to demonstrate that its policy 'actually furthers' a compelling interest when applied to 'the particular claimant whose sincere exercise of religion is being substantially burdened.'" *Tucker v Collier*, 906 F3d 295, 302–03 (5th Cir 2018), quoting *Holt*, 574 US at 363–64. Indeed, the Supreme Court instructs that courts "cannot rely on broadly formulated governmental interests," but rather must scrutinize "the asserted harm of granting specific exemptions to particular religious claimants." *Mast v Fillmore County*, --- S Ct ---, 2021 WL 2742817 (Gorsuch, J, concurring in decision to grant, vacate, and remand), quoting *Fulton*, 141 S Ct at 1881, in turn quoting *Gonzales v O Centro Espirita Beneficente Uniao do Vegetal*, 546 US 418, 431 (2006).

Reference to the *least restrictive means* requires the government to show "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties." *Burwell v Hobby Lobby*, 573 US 682, 728

(2014). Such showing is "the most demanding test known to constitutional law." *City of Boerne v Flores*, 521 US 507, 534 (1997) (citation omitted). Under RLUIPA, this means that the chosen policy must be the "least restrictive of [the prisoner's] right to exercise his religious beliefs 'among available, effective, alternatives.'" *Moussazadeh*, 703 F3d at 795, quoting *Ashcroft v American Civil Liberties Union*, 542 US 656, 666 (2004). A court shouldn't "assume a plausible, less restrictive alternative would be ineffective." *United States v Playboy Entertainment Group, Inc*, 529 US 803, 824 (2000). It is instead part of the burden on the government to affirmatively establish that alternatives are ineffective. *Ali v Stephens*, 822 F3d 776, 786 (5th Cir 2016). "Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S Ct at 1881.

Atomanczyk moves for summary judgment on the issue of whether he sincerely holds his religious beliefs. He and Defendants both move for summary judgment on the merits as to each of the alleged religious violations.

### i.  Sincerity

Atomanczyk seeks summary judgment that he sincerely holds his religious beliefs. Dkt 109 at 17–19. Defendants oppose summary judgment in this respect. Dkt 114 at 7–8.

Inquiry into religious sincerity is constrained. The Fifth Circuit requires district courts to exercise "judicial shyness" when addressing this question. *Betenbaugh v Needville Independent School District*, 611 F3d 248, 262 (5th Cir 2010). This means that sincerity is "generally presumed or easily established." *Moussazadeh*, 703 F3d at 791. It certainly isn't the place of federal, state, or local government to dictate how religion should be practiced or to define who is and isn't devout. As observed by the Supreme Court, "Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs." *United States v Ballard*, 322 US 78, 86 (1944).

Scrutiny of the religious sincerity of a plaintiff is "almost exclusively a credibility assessment." *Moussazadeh*, 703 F3d at 792, quoting *Kay v Bemis*, 500 F3d 1214, 1219 (10th Cir 2007). When contested, the issue depends strongly upon the specific facts of

the case. The narrow question is whether the plaintiff personally believes that the desired religious practices are deeply important. See *Sossamon v Lone Star State of Texas*, 560 F3d 316, 332–33 (5th Cir 2009).

Defendants resist summary judgment on this issue by pointing to an instance where Atomanczyk temporarily changed his religious preference from Orthodox Jewish to Messianic Jewish, with the latter being (at least according to the TDCJ) a sect of Christianity. Dkt 114 at 7–8. This fluctuation, they say, shows Atomanczyk isn't a sincere member of the Jewish faith. Defendants also point to Atomanczyk's failure to request a transfer back to Stringfellow. By this they mean that if he seriously wanted to participate in the Enhanced Jewish Services Program, he would have sought to have his medical restrictions reassessed. Those two perceived inconsistencies "are not merely inevitable lapses in faith that all religious people suffer," Defendants argue, but instead "are evidence that he is perpetuating a fraud." Id at 8.

Decision by the Fifth Circuit in *Moussazadeh* largely forecloses such argument. See 703 F3d at 790–91. The government there contested the sincerity of the plaintiff's Jewish practice because he'd purchased non-kosher food from the dining hall and had failed to request a transfer from Stiles to Stringfellow. 703 F3d at 791. To the contrary, that prisoner was born and raised Jewish, had requested kosher meals, and regularly practiced Judaism while incarcerated. The Fifth Circuit found plaintiff to have established sincerity as a matter of law, stating, "A finding of sincerity does not require perfect adherence to beliefs expressed by the inmate, and even the most sincere practitioner may stray from time to time." Ibid. And it was of note that the government hadn't challenged sincerity until the lawsuit. Id at 791–92.

This case presents similar circumstances and so deserves a similar result. Ample evidence exists that Atomanczyk has long been a member of the Jewish faith. His parents are Jewish, meaning that he practiced the religion (including a kosher diet) as he grew up. Dkt 109-2 at ¶¶ 2–3 (Atomanczyk declaration). He's also practiced Judaism in meaningful ways since his incarceration.

Id at ¶¶ 5–8. Atomanczyk also argues that the supposed evidence of his insincerity is insignificant. For one thing, the TDCJ considered him to be Jewish prior to this lawsuit, including explicit recognition of that religious faith preference and allowing him to participate in the Enhanced and Basic Jewish Services Programs. See Dkt 107-3 at 3 (Rutledge affidavit). He acknowledges temporarily changing his religious preference but establishes that this was in response to a falling out with his rabbi for "not being sufficiently zealous himself." Id at 9; see also Dkt 109-2 at ¶¶ 12–13. And the supposed failure to request transfer to Stringfellow is plainly insufficient to raise a contested issue. *Moussazadeh*, 703 F3d at 791–92.

It is told that David sent Uriah the Hittite to die in battle at the front of a great war so that David might marry Bathsheba, Uriah's wife. The consequences were devastating, but David sincerely repented and was ultimately forgiven. See 2 Samuel, chapters 11 & 12; see also Psalm 32. Likewise is Saul of Tarsus, a chief persecutor of the early Christians. He put many to their death before his conversion on the road to Damascus, after which he lived out his life in travels and writings as the Apostle Paul. See Acts, chapter 9. Examples such as these abound, once leading the Seventh Circuit to observe that "a sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance; for where would religion be without its backsliders, penitents, and prodigal sons?" *Grayson v Schuler*, 666 F3d 450, 454 (7th Cir 2012); see also *Moussazadeh*, 703 F3d at 791–92 (quoting *Grayson*).

Religious belief in this country isn't to be taken lightly, even that of a prisoner convicted of the gravest crime. And no genuine dispute of material fact actually exists here as to the sincerity of Atomanczyk's religious beliefs. Summary judgment will be granted in his favor on this issue.

### ii. Substantive violations

Atomanczyk asserts several substantive RLUIPA violations pertaining to denials of stringently certified kosher food, participation in communal prayer services, access to rabbinic visits, and access to undefined chaplaincy services. Atomanczyk and Defendants seek summary judgment on all violations, thus

requiring an analysis as to each of substantial burden, compelling governmental interest, and least restrictive means.

Summary judgment will be denied in full on each violation due to failure by both motions to meet the Rule 56 standard. The only question that can be resolved now as a matter of law is whether prison safety and security is a compelling governmental interest. It is. But beyond that, this case presents many complicated factual and legal issues, which the record and arguments don't clearly resolve. Where this is so, the better course is to proceed to a full trial. See *Northbrook Indemnity Insurance Co v Water District Management Co*, 892 F Supp 170, 172 (SD Tex 1995), quoting *Anderson*, 477 US at 255; see also Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 2728 (West 4th ed April 2021 update).

## A. Kosher food

Atomanczyk seeks summary judgment on his contention that he's denied kosher food of sufficient preparation. Defendants move for summary judgment on assertion that they do provide him kosher food and haven't imposed a substantial burden on Atomanczyk's religious practice by failing to provide the precise food that he seeks. Dkt 107 at 27.

*As to substantial burden.* Since June 2017, the TDCJ has provided Atomanczyk free entrees from KO Kosher Service. Atomanczyk rejected these for a time but now eats them out of concern for his physical health. See Dkt 109-2 at ¶¶ 30–31. He rejected them on contention that his orthodox sect of Judaism requires heightened stringency in certifying food as kosher. Rabbi Marinovsky (as Atomanczyk's expert) points to the international Association of Kashrus Organizations, which describes its membership as "based on observance of the highest level of kashrus possible." Dkt 109-3 at 4 (expert report). And, Marinovsky notes, KO Kosher Service isn't included in the AKO's list of approved *hechshers*. Dkt 109-12 at 3–6 (deposition).

Defendants move for summary judgment on this issue, while disagreeing with the characterization by Atomanczyk that they're denying him kosher food. They submit the affidavit of Jonathon Logan, the TDCJ kitchen captain to establish that the entrees provided to Atomanczyk from KO Kosher Service are kosher-

certified and nutritionally sufficient. Dkt 107-6 at 2–4. He specifies the food provided to Atomanczyk as follows:

> Mr. Atomanczyk receives a "Johnny sack" for breakfast that generally consists of milk, cereal, fruit, 4 oz. peanut butter, two packets of jelly, sliced bread, coffee, and a fruit bar; and provides 1500 to 1700 calories of energy.
>
> His lunch "Johnny sack" generally consists of a shelf stable entree, vegetable cup, drink mix packet, sliced bread, 4 oz. of peanut butter, a box of cereal, and a sandwich; and provides 1840–1940 calories of energy.
>
> For dinner, "Johnny sack" generally consists of a shelf stable entree, vegetable cup, drink mix packet, sliced bread, 4 oz. of peanut butter, cereal, and a sandwich; and provides 1840–1960 calories of energy. . . . His shelf stable entrees, etc. may be heated in his hot pot.

Id at 3 (internal citation omitted). A *Johnny sack* is a package of food provided to those in administrative segregation. Ibid. Defendants highlight the fact that they provide other food that Atomanczyk accepts, believing it to be sufficiently kosher. That's all they're required to do, they say. Dkt 114 at 12.

The KO Kosher Service entrees that Atomanczyk refuses as insufficiently kosher are the so-called *shelf-stable entrees* in the list above. These consist of various ready-to-eat meals, like sweet and sour vegetable protein slice, chili, and stew. See id at 9, 11, 13. Atomanczyk also says that the amount of peanut butter he can eat is limited due to digestive issues. And so, before he began eating the KO entrees, he only ate "some of this food, such as the fruit & grain bars and bowls of cereal, which both have Orthodox hechshers on the individual packaging." Dkt 109-2 at ¶ 29. That food by itself is, according to Atomanczyk, plainly insufficient from a dietary perspective. He thus argues that Defendants' overall policy with regard to providing him food imposes a substantial burden on his religious practice.

It's beyond contest that fidelity to a kosher diet is deeply important to the practice of many adherents to the Jewish faith.

See generally *Ran-Dav's County Kosher, Inc v New Jersey*, 608 A2d 1353, 1355–56 (NJ 1992). And unlike the provision of religious items, for instance, the provision of kosher food by its nature concerns "an essential benefit given to every inmate, regardless of religious belief." *Moussazadeh*, 703 F3d at 793–94. This means that the outright denial of kosher food to Jewish inmates imposes a substantial burden on their religious practice. See ibid; see also *Baronowski v Hart*, 486 F3d 112, 125 (5th Cir 2007).

But this case doesn't involve an outright *denial* of kosher food. It instead concerns a request for *specialized* religious food. And as an initial matter, the parties fail to sufficiently develop the record to definitively establish whether—and the extent to which—the provision of food "truly pressures" Atomanczyk "to significantly modify his religious behavior and significantly violate his religious belief." Adkins, 393 F3d at 569–70. To what extent does Atomanczyk's particular sect of Judaism actually require what he demands? To what extent has that alleged requirement actually been violated? How difficult would it be for the TDCJ simply to meet that requirement? What options are available to Atomanczyk to work around what he alleges has been denied to him? The parties have starkly different factual takes on these questions. Such material disputes of fact preclude summary judgment for either party as to whether Defendants' policy for providing kosher food to Atomanczyk substantially burdens his religious practice.

As a related matter, the parties don't sufficiently address the underlying question of law here or apply it to the undisputed (supposedly, from each of them) material facts. Neither party makes a sustained argument to affirmatively establish whether RLUIPA requires the government to accommodate the nuanced dietary requirements of a particular religious sect, including Atomanczyk's particular sect of Judaism. Even light research discloses that federal courts are divided on the issue of requests by prisoners for specialized religious food.

It appears that most have concluded that a failure by state governments to provide such food to accommodate the tenets of a specific religious sect could impose a substantial burden. For example, see *Jones v Carter*, 915 F3d 1147, 1151–52 (7th Cir 2019)

(affirming judgment in favor of claim following bench trial); *Carter v Fleming*, 879 F3d 132, 140 (4th Cir 2018) (reversing summary judgment against claim and remanding); *Shakur v Schriro*, 514 F3d 878, 888–89 (9th Cir 2008) (same); *Williams v Annucci*, 895 F3d 180, 185, 188 (2d Cir 2018) (vacating summary judgment against claim and remanding); *Abdulhaseeb v Calbone*, 600 F3d 1301, 1312–19 (10th Cir 2010) (same); *Muhammad v Wheeler*, 171 F Supp 3d 847, 849–50, 854–55 (ED Ark 2016) (denying summary judgment); *Abdul-Aziz v Lanigan*, 2020 WL 3287229, *11–15 (D NJ) (same). But some have refused to require governments to provide a particularly nuanced version of religious food. For example, see *Patel v United States Bureau of Prisons*, 515 F3d 807, 810–14 (8th Cir 2008) (affirming summary judgment against claim); *Hudson v Caruso*, 748 F Supp 2d 721, 729–30 (WD Mich 2010) (granting summary judgment); *Boyd v Lehman*, 2006 WL 1442201, *1–2, 10 (WD Wash) (same). Indeed, the Sixth Circuit has issued opinions going both ways, in a manner placing in bright relief the fact-intensive nature of this inquiry. Compare *Pleasant-Bey v Tennessee Department of Correction*, 2019 WL 11880267, *3 (6th Cir) (finding fact dispute on substantial burden on denial of nuanced halal food, where standard halal menu violated ordinary halal rules), with *Robinson v Jackson*, 615 F Appx 310, 313–14 (6th Cir 2015) (finding no substantial burden on denial of nuanced halal food, where standard halal menu was compliant with ordinary halal rules).

The Fifth Circuit hasn't addressed the issue yet. But see *Morris v Lumpkin*, 850 F Appx 318 (5th Cir 2021) (declining to reach claim where not originally raised in complaint). And only two district courts within it have, in cases involving specialized requests for kosher food under particular Jewish practice. See *Muhammad v Wiles*, 2020 WL 1234946 (WD Tex); *Palacio v Party*, 2020 WL 5233031 (SD Tex). But those decisions were decided on application for temporary restraining order, making them less helpful here. For example, *Palacio* concluded that the likelihood of success on the merits couldn't be determined without any discovery having occurred, due to the fact-intensive nature of the issue. See 2020 WL 5233031 at *1. And while *Muhammad* found little likelihood of success on the merits, it did so mainly on consideration of standards pertinent to a claim asserted there

under the First Amendment, which is absent here and proceeds under a different standard. See 2020 WL 1234946 at *4–5, citing *Freeman v Texas Department of Criminal Justice*, 369 F3d 854, 857 n 1 (5th Cir 2004) (as to standards under the First Amendment). Neither district court had occasion to consider summary-judgment evidence or conduct the full burden-shifting analysis that RLUIPA requires.

The parties are directed to address standards in this regard much more closely in pretrial briefing.

*As to compelling governmental interest.* The foregoing blurs somewhat into the unclear positions of the parties as to compelling governmental interest. As alternatives to the present arrangement, Atomanczyk suggests Defendants purchase kosher entrees with other *hechshers* or install a kosher kitchen at Polunsky. Dkt 109 at 24–25. Defendants don't state it outright, but their assertion of compelling interest for denying those requests appears to be one of cost. That is, they say it would be too burdensome to force the TDCJ to pay for either of Atomanczyk's suggested alternatives. See Dkt 114 at 11–13.

Pertinent here is Fifth Circuit pronouncement that a general "interest in security and costs" isn't a compelling governmental interest. *Ali*, 822 F3d at 785 (citation omitted). Rather, "the government must show that 'the compelling interest test is satisfied though application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened." Ibid, quoting *Holt*, 574 US at 363.

Summary judgment will be denied for Atomanczyk on this issue. He fails to establish the precise cost of either of his suggested alternatives. See Dkts 109 at 23–25, 114 at 11–13. He addresses this topic briefly, pointing to the deposition of Douglas Sparkman, who is the TDCJ assistant director of Laundry, Food, and Supply and a defense expert. Dkt 109 at 24–25, citing Dkt 109-14 at 6 (Sparkman deposition). But this is cursory, being entirely without context or comparison. Absent details, it is impossible to tell whether the governmental interest is compelling as applied to the specific circumstances of Atomanczyk's diet.

*As to least restrictive means.* Neither party addresses whether Defendants' policy of providing Atomanczyk with entrees prepared by KO Kosher Service is the least restrictive means to effect the asserted compelling governmental interest. But as aptly and recently stated by Justice Neil Gorsuch, "RLUIPA prohibits governments from infringing sincerely held religious beliefs and practices except as a last resort." *Mast*, --- S Ct ---, 2021 WL 2742817 at *3 (Gorsuch, J, concurring).

Summary judgment will be denied on this issue.

### B. Communal prayer services

Defendants at present don't permit Atomanczyk to participate in communal prayer services on assertion that he must remain in administrative segregation. Atomanczyk moves for summary judgment, contending that this improperly denies him participation in those services. Defendants move for summary judgment, asserting that it has a compelling governmental interest in prison safety and security and that their policy is the least restrictive means by which to serve that interest. Dkt 107 at 29.

*As to substantial burden.* Defendants deny that their policy imposes a substantial burden on Atomanczyk's religious practice. The failure to provide access to religious services, they say, is different than the failure to provide religious food that conforms with religious requirements. Food is a biological need and must therefore be provided in all instances. But nothing in RLUIPA requires the government to affirmatively provide or subsidize nonessential religious practice. See Dkt 114 at 19–21, quoting *Abdulhaseeb v Calbone*, 600 F3d 1301, 1320 (10th Cir 2010). Atomanczyk disagrees, arguing that "Jewish law places great emphasis on communal prayer." Dkt 109 at 27. To deny him this, he says, imposes a substantial burden on his religious practice.

It's again beyond contest that dedication to daily and weekly congregation for prayer and other religious activities is deeply important to the practice of many adherents to the Jewish faith. See *Baronowski*, 486 F3d at 124. But the Fifth Circuit holds that the failure to provide unfettered opportunities to congregate doesn't necessarily impose a substantial burden. See id at 124–25, citing *Adkins*, 393 F3d at 569–70. Even so, it also strongly

suggests that a policy affirmatively prohibiting such congregation would do so. *Adkins*, 393 F3d at 571.

It does appear that Defendants affirmatively prohibit Atomanczyk from participating in the pertinent services by keeping him in administrative segregation. But it isn't clear whether this situation is more akin to an affirmative prohibition on access to an opportunity or to a passive failure to provide an opportunity. See *Adkins*, 393 F3d at 569–71; *Baronowski*, 486 F3d at 124. For instance, formal programs for the practice of Jewish beliefs are provided only at Stringfellow, Jester III, Stringfellow, Stiles, and Wynne—not Polunsky, where Atomanczyk is currently housed. See Dkt 110-1 at 3 (TDCJ chaplaincy manual). But TDCJ guidance generally allows for the scheduling of religious activities at other units such as Polunsky—subject to unit rules and regulations. See Dkt 110-3 at 5–7 (TDCJ memo on religious programming). And the rules pertaining to the Polunsky unit simply aren't explained, much less the circumstances of any requests by Atomanczyk (or denials by Defendants) to participate in such services. Likewise, the details of Atomanczyk's confinement aren't apparent from the present record, leaving it uncertain what administrative segregation entails, what type of contact is allowed, how often, and for what purposes.

In other words, it's impossible to determine whether Defendants have imposed a substantial burden because it's not fully clear what's even been imposed. Summary judgment must be denied for Atomanczyk on the present record.

*As to compelling governmental interest.* Defendants assert that the compelling governmental interest justifying their actions is the safety and security of other inmates and jail staff. That is, they say that Atomanczyk can't be allowed to participate in communal prayer services for fear that he may hurt someone. See Dkt 107 at 29. Atomanczyk doesn't respond, thus waiving opposition to entry of summary judgment on this issue. Rule 7.4, Local Rules of the United States District Court for the Southern District of Texas.

The Supreme Court instructs district courts considering RLUIPA claims in the prison context to be mindful of "an institution's need to maintain order and safety" when considering

a prisoner's request for religious accommodation. *Hayman v Villarreal*, 2019 WL 4727757, *3 (SD Tex), quoting *Cutter v Wilkinson*, 544 US 709, 722 (2005). Writing for a unanimous Supreme Court, Justice Ruth Bader Ginsburg explained at length the special interests present in the context of a RLUIPA claim:

> We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns. While the Act adopts a "compelling governmental interest" standard, context matters in the application of that standard. Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. They anticipated that courts would apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.

544 US at 722–23 (citations omitted).

In other words, "Prison security is, of course, a compelling state interest." *Dunn v Smith*, 141 S Ct 725, 725 (Kagan, J, concurring in the denial of an application to vacate injunction). Summary judgment will be entered to that effect.

*As to least restrictive means.* Atomanczyk argues that an alternative is readily available—namely, Defendants should install a closed-circuit video in his cell so that he can participate remotely in prayer services with other inmates. See Dkt 109 at 27–28. Defendants argue that they aren't capable of installing such a video system. See Dkt 114 at 20–21. To the contrary, Atomanczyk makes much of the fact that Defendants offer other video programs to inmates. See Dkt 109 at 22–23. But that's insignificant, Defendants say, because those programs involve either prerecorded videos or live conversations with persons who are present at the Polunsky unit. Prerecorded videos, they argue, aren't consistent with Atomanczyk's request that he participate in

prayer services in real-time. And as to closed-circuit conversations, Defendants claim that they don't have the capacity to stream live communal prayer services occurring at *other* units, like Stringfellow or Jester III. Denying him communal prayer services while he remains in administrative segregation, Defendants say, is the least restrictive means because it's the only one available. Dkt 114 at 20–21.

As noted above, RLUIPA requires that the chosen policy be the "least restrictive of [the prisoner's] right to exercise his religious beliefs 'among available, effective, alternatives.'" *Moussazadeh*, 703 F3d at 795, quoting *Ashcroft*, 542 US at 666. The Supreme Court cautions that the analysis not "assume a plausible, less restrictive alternative would be ineffective." *Playboy Entertainment Group*, 529 US at 824 (2000); see also *Ali*, 822 F3d at 786. Notably, briefing by the parties closed prior to the COVID-19 pandemic. It's now beyond any real question that adequate video-conferencing services are readily available in certain prison contexts. For example, both rearraignments and sentencings in the Southern District of Texas largely proceeded exclusively by video connection to prisoners at holding facilities, with adequate provision made for both security concerns and protection of prisoner rights.

Summary judgment will be denied. The parties must at trial focus presentation on the ability within the prison system—in mind of safety and security obligations—to allow for the accommodation requested by Atomanczyk.

## C. Rabbi visits

Atomanczyk seeks summary judgment on his contention that Defendants should be required to pay for a rabbi to visit Polunsky, as they do for Stringfellow, Jester III, Stiles, and Wynne. Defendants move for summary judgment on assertion that they haven't imposed a substantial burden on Atomanczyk's religious practice because they aren't obligated to pay rabbis to visit Polunsky. Dkt 107 at 30.

*As to substantial burden.* It can be assumed that rabbinic visits are deeply significant to Atomanczyk's religious practice such that its outright denial would impose a substantial burden. Indeed, neither party addresses whether the failure to provide

rabbi visits "truly pressures" Atomanczyk to "significantly modify his religious behavior and significantly violate his religious beliefs," such that substantial burden can be found. *Adkins*, 393 F3d at 569–70. They instead simply appear to assume this point.

Defendants respond on a collateral point, noting that they don't affirmatively deny such visits. They argue that RLUIPA only requires them to refrain from imposing substantial burdens—with no additional requirement imposed to bear the cost of affirmatively making such accommodations. They'd gladly allow rabbis to visit Polunsky, they say, but none have volunteered. See Dkt 114 at 19.

It is generally correct that a government entity doesn't impose a substantial burden where it merely fails to provide a religious item or service. *Moussazadeh*, 703 F3d at 793–94; see also *Abdulhaseeb*, 600 F3d at 1321. And the Fifth Circuit has explicitly applied this rule in the context of providing access to minister-led religious services. See *Baronowski*, 486 F3d at 124–25; *Adkins*, 393 F3d at 571; *Mayfield*, 529 F3d at 613–14. Such decisions establish that it will ordinarily be proper for the TDCJ to implement a nondiscriminatory policy allowing volunteer ministers to administer religious services. *Brown*, 929 F3d at 230. This is so because it is "the lack of qualified volunteers" that imposes the substantial burden on religious practice—not the pertinent government policy. Id at 231.

This all assumes that the volunteer-minister policy is administered uniformly. There's at least some evidence suggesting that Defendants apply their policy of providing access to religious ministers in disparate ways. That is, it's undisputed that the TDCJ pays for rabbis to visit some prisons but not others. See Dkt 110-1 at 3–4 (TDCJ chaplaincy manual). Atomanczyk also points to Defendants' motion, noting that they say it would cost (*only*, in Atomanczyk's view) $3,600 a year to pay a rabbi to visit Polunsky. Dkt 116 at 13–14. But that figure lacks context in relation to the cost of visits to other units.

As such, this claim bears similarities to that considered by the Fifth Circuit in *Mayfield v Texas Department of Criminal Justice*. Odinist inmates there sought to conduct minister-led religious

services each month. Not many ministers met the TDCJ's security-training requirements, so qualified ministers were only able to visit the prison roughly every eighteen months. This by itself didn't pose a problem. 529 F3d at 614. But evidence suggested that the TDCJ made exceptions to the volunteer-minister requirements for Muslim prisoners. As such, the Fifth Circuit reversed the district court's grant of summary judgment on the issue of substantial burden, reasoning that the plaintiff had "presented evidence which calls into question the uniformity of the policy's application at the Hughes Unit, suggesting that the burden is at least partially imposed by the TDCJ's disparate application." Id at 613–14; see also *Brown*, 929 F3d at 231.

Summary judgment will be denied. It may well be the case that Atomanczyk's failure to receive rabbi visits is properly attributed to the lack of qualified volunteers. But the parties must develop the record with regard to the TDCJ's policy for providing ministers for Stringfellow, Jester III, Stiles, and Wynne, while declining to do so for Polunsky and other prisons.

*As to compelling governmental interest.* Atomanczyk argues that Defendants fail to support their policy with any compelling governmental interest. By that, he means that the supposed governmental interest is *underinclusive* because the TDCJ pays for rabbis to visit Jewish prisoners at some—but not all—prisons. Dkt 109 at 26–27.

Such argument is in line with Fifth Circuit authority, which instructs that the governmental interest in denying an accommodation is "dampened" when the same accommodation is offered to others. *Moussazadeh*, 703 F3d at 794–95. "A law's underinclusiveness—its failure to cover significant tracts of conduct implicating the law's animating and putatively compelling interest—can raise with it the inference that the government's claimed interest isn't actually so compelling after all." *Ali*, 822 F3d at 785, quoting *Yellowbear v Lampert*, 741 F3d 48, 60 (10th Cir 2014) (opinion by Gorsuch, J). Where a policy is underinclusive, "the prison must provide 'an adequate explanation for its differential treatment.'" *Ware v Louisiana Department of Corrections*, 866 F3d 263, 269 (5th Cir 2017), quoting *Ali*, 822 F3d at 787. Among other ways, a prison may rebut

allegation of underinclusiveness "by showing that it hasn't acted in a logically inconsistent way—by (say) identifying a qualitative or quantitative difference between the particular religious exemption requested and other . . . exceptions already tolerated." *Ali*, 822 F3d at 787, quoting *Yellowbear*, 741 F3d at 61.

Defendants don't respond on this issue, choosing instead to rely on their argument as to why their policy doesn't impose a substantial burden. Dkt 114 at 18–19. As such, concerns as to underinclusiveness remain. Even so, summary judgment will be denied to Atomanczyk. The prison policy at issue touches interests of (at least) safety, security, and cost. A fully developed record—especially as to the issue of substantial burden—will better inform whether the apparently underinclusive policy is consistent with a compelling governmental interest. *Ali*, 822 F3d at 787, quoting *Yellowbear*, 741 F3d at 61.

*As to least restrictive means.* Neither side addresses whether the TDCJ's policy of allowing volunteer rabbis to visit Polunsky, while declining to pay rabbis to do so, is the least restrictive means available to effect the State's compelling governmental interest (once that interest is properly defined and understood). Quite obviously, the need for a developed record equally applies to this consideration. This issue will proceed.

### D. Chaplaincy services

Atomanczyk appears to also allege that Defendants are denying him regular chaplaincy services in violation of RLUIPA. For example, see Dkt 21 at ¶¶ 1, 29; see also Dkt 109 at 7. It isn't clear how this varies (if at all) from his claims as to participation in communal prayer services and access to rabbinic visits. And it isn't otherwise addressed in the motions.

This claim will proceed to the extent asserted.

### 4. Conclusion

The motion for summary judgment by Defendants Texas Department of Criminal Justice and Bryan Collier is GRANTED IN PART and DENIED IN PART. Dkt 107. No genuine dispute of material fact exists as to prison security being a compelling governmental interest in the context of Atomanczyk's claim regarding participation in communal prayer services under

RLUIPA. The motion is GRANTED to that extent only. It is DENIED in all other respects.

The motion for summary judgment by Plaintiff Aharon L. Atomanczyk is GRANTED IN PART and DENIED IN PART. Dkt 109. No genuine dispute of material fact exists on his RLUIPA claim as to the sincerity with which he holds his religious beliefs. The motion is GRANTED to that extent only. It is DENIED in all other respects.

SO ORDERED.

Signed on July 12, 2021, at Houston, Texas.

Hon. Charles Eskridge
United States District Judge